and Cheryl Haider, is it? Haider. We have for the appellant, Donald Heck, and for the appellee, Donald Shearing. Mr. Heck. May I please report, Mr. Shearing? Justices, I know that you've already read the brief, the factual part of the brief. Essentially why we are here is there are two points that you can tell very readily from reading the brief. One is that we feel that based upon the law, the facts of this case, that Judge Drummond has a view to discretion and his decision concerning the maintenance issue is against the manifest way of the evidence. I think that when you review this and the file, the First of all, we started in our argument from the fact that they did not ask. Basically they were asking for a reduction in maintenance. And as Mr. Shearing put in his brief, you threw in the catch-all of any other relief that the court may deem equitable. Isn't there a case that says termination of maintenance is reduction of maintenance? Yes, there are some cases with that, but they were not specifically planned. There is cases to that effect. As far as the coming before the court, what we came before the court on is actually the second time that Mr. Hader had filed to reduce the maintenance. That's all set forth in the brief and in the factual scenario. The situation with that, quite candidly put, is that on this time about, there really were no significant changes in circumstances that were not anticipated throughout this matter. When you look at our brief, and then when you look at Mr. Shearing's brief on behalf of Mr. Hader, you find that he quotes the law, which that's fine, he quotes the law, but he says basically the changes in circumstances were, one, that, this is on page two of his reply brief, that the respondent is employed on a full-time basis at destination travel and coach. That was anticipated. If you review the law, if you review the facts in this case, as I put in my brief, and I'm not going to quote law or stand as a statute reversed, but if you review the document itself, you'll see that Judge Drummond had throughout this matter told her, and I think the law tells anyone, whether you're getting rehabilitative maintenance or whatever sort of maintenance, other than maintenance and gross, you've got to make yourself self-sustaining, at least try. Well, in this situation, it was anticipated she was going to get a job, and when we tried this case before Judge Drummond, she was working. She was actually working on a part-time basis, but when we tried the case, because of the medical history of her boss, she had been raised on a temporary basis from $11 an hour to $13 an hour, and that was only on a temporary basis. By the time we got into court, her boss had returned, and in fact, the hours were either being cut or in the process of being cut, and the money had gone back. In any event, at that point, she was working part-time. The record speaks for itself. She is making at $1.11 an hour, and then with the bump, she was making $13 an hour. Well, the reality of it is that these people, meaning the haters in their marital state, and they were married for 13 years, were in fact living a very, very comfortable lifestyle. Mr. Hater, and it is replete in the documents, Mr. Hater was making a significant amount of money throughout this, throughout the married life. They lived in a very comfortable home. They lived in a very comfortable circumstances, really wanted for very little, that since she became employed, again, Judge Drummond kind of, it was for Mrs. Hater, it was kind of like trying to get away from a tar baby because he is telling her you do this or you don't do that, and when she tried to do it, she gets slapped by the court. Well, this was the final, as I put it, the final and the last big insult. The bottom line is you go to work, you get you a job. Well, she did that. She not only did that, she tried to make herself more employable. As in point two of the respondent's argument or in the respondent's brief, is that she went to John Wood Community College. She got a degree. Now, the argument was, and Judge Drummond seemed to chastise the fact, you are not working in your area. Well, that is all well if you say that, but as it is pointed out in our brief, she not only tried in the areas that we have, in the opportunities we have in our area and in the general area, there were no jobs in that. She got the degree. She got the degree that, again, was anticipated, but once she got it, she not only made application not twice, but three times, as we put in our brief, and it is all set up in the record. She made application, and it was not just, here is my application, and you hire and walk away. She followed it through. She had no job in her degree area from John Wood. She did have the job at the travel agency as put forth, but even that, when she is making that money, and it is again in the record, she is making approximately $20,000 a year. That is her husband at that point, ex-husband at that point, is making according to the true facts, not what he testified to, but according to the evidence that is before the court, because his testimony, I think, became incredible, and there should not have been any credence placed on his testimony at all. He was making, even if you follow his testimony, in excess of $100,000 a year, and if you follow the true facts, as we put forth in our brief and supported by the record, at that point in late July of the year that we tried this in 2009, if you look at that, he had made somewhere in approximately $70,000, depending on what figure you plug in there. So for seven months of the year, with five more months to go, he had made $70,000. He not only gets a salary, he gets this incentive or this commission, and so he made, again, approximately $64,000, $65,000 in salary, $25,000, $27,000. That's as of the date of the hearing. So he's on line, contrary to what he said, as far as dropping income, even his boss, that I subpoenaed and testified, said he made about $3,000 more in that period of time than he did the year before. So we have a woman that's making $20,000, we have a man that is making really in excess, I think, in the area of about $130,000, $140,000 or higher. We don't know because it was at the end of the year, and the discrepancy there, I think, falls on our side of the fence. As far as the statement that is... Mr. Heck, was the original maintenance award denominated as rehabilitative maintenance? I don't think it was. But even if it was, Justice, I don't think it makes any difference. But I don't think that it was. I think that what's happened here is that at the time, and it's not before this Court, I think that there was never any question at the trial of this case, either the pre-final hearing, the temporary matters, or at the end, that my client, Ms. Hader, Cheryl Hader, was a stay-at-home mother. That's all she did. Now, she had tried and was doing some sales of some artwork because she's very good at that, but it wasn't significant. Was there testimony about what the value of her artwork was? Not really. There was some testimony. It wasn't of any great value. It was, at the time, something that the Court anticipated that she could do, but that's why, again, in my opinion, and based upon the record, why the John Wood was so important, because she had – with that, she'd have a degree. It was something more that she could just do than just say, I do it because it's a hobby at home when I'm not changing the children's diapers or not taking them to the basketball game or whatever the situation might be. The problem in the whole scenario here is that in his argument, and contrary to our brief, when Mr. Shearing makes these arguments, they've all either been rebutted by the facts of the case or that when you look at page five of his brief, it's readily not only anticipated but understandable about what's going on here. And I'm just going to go through those very, very quickly as far as she's employed. Well, I've been through that. That's number one. Number two, she completed her education. Both anticipated. Number three, since her graduation, she's applied to Add Forest and Blessing Hospital. That's true, but there was another one as set forth in the brief. There were three applications that she not only applied for, she, in fact, followed through. The next one is that she stated that she had looked at other travel agencies' work but never submitted any written application. Again, the situation with that is, why should she upset an apple cart if there wasn't anything available and it wasn't better money? That she had a job. She had a job making $11 an hour up to $13 an hour. Why should she upset her boss? Because in the travel agency, it was, in fact, and is, in fact, of a very good quality. She took trips. Well, she did take trips. There's no doubt about that. She took trips to, I think, Alaska and she took a trip to Mexico. Those were all, she wasn't paid for those trips. Her company paid for those to go, but she went on fact-finding trips or, I guess, experience trips. When she went to those things, for the most part, she was there to either see what was going on. By that I mean see the lay of the land. She was there to look at, escort other travelers. That was part of her job. She made absolutely no money for that. She was engaged to be married. That was just as we put it on our brief. They throw that in there. What difference is that? The fact she was engaged to be married. It seems to me that in my practice, every time I put somebody on the witness stand, either a man or a woman, they're engaged to be married because it's not really good to say, well, I'm just living with a guy. But they are engaged to be married. But Mr. Shearing, as I put in my brief, threw it out. Mr. Shearing threw that out there in his brief, and he also used the name, as we put in there, of her current name, which is Shetty. That's, again, I think just to, that wasn't a fact at the time of the hearing. It wasn't a fact at any point, but he throwed it there to try to get some, in my opinion, prejudice to the court. As far as the... Mr. Heck, was her degree an associate's degree? Yes. Her degree is an associate's degree. That's the only degree available at John Wood Community College. As far as her taking the kids to Disneyland, and I did jump over that and I'm going to go back, but as far as taking the kids to Disneyland, that was all approved by her husband. There was never any question about that. It was a life experience for the children at absolutely no cost to anybody. If there was some cost, it was incidental cost, and Kevin Hader, the father, knew about it and certainly not only condoned it, was I think appreciative of it. But that is for Mr. Shearing. The next thing I think that's important to point out is that, as we put it in the brief, that I don't think, and the law is quite clear, I don't think it's necessary for us as a person receiving maintenance to deplete all of our assets awarded to us before either asking for increase in maintenance, which apparently Mr., excuse me, Judge Drummond anticipated or wanted us to do. That's not followed by the case law nor by the facts. In this situation, as pointed out, she had to sell the former marital home. She couldn't maintain it. Two things she couldn't do. She couldn't pay for it. Judge Drummond points out the assets were 60-40. I can't argue that. They were, but there was no liquidity there. You cannot, if you put down to bare assets, it was much less than that. It was probably 60-40 the other way, because the assets that she received, if she withdrew the money, for example, from the IRAs or if she withdrew the money from the various funds, there's not only a tax consequence, there's a penalty consequence. She can't do it without depleting. Secondly, I think it's important to note that she was given a house that was in need of repairs, all supported by the record. When it was in need of repairs, she had no money at all to repair the house. So she's in this, as I put in the brief, this catch-22, where she is almost spinning in circles. What do I do? What do I do? So she downsizes. She downsizes. She tries to maintain. She cannot keep the lifestyle that she had during the marriage, quite candidly, because there's just no money. She's working as best she can in the circumstances in which she finds herself, and she has no money. To the contrary, she is also paying, and I think that's important, she's paying child support to a Mr. Hader. She's paying child support, as is ordered, and all of that is not a deduction to her, is not a reportable income to Mr. Hader, which is $600 a month, which is $7,200 a year. In the meantime, when he was paying her maintenance, obviously that is not only deductible from him, it is reportable by her, so she's, again, spinning. She's paying out money in child support, and she's getting no deduction for it. She's getting money in the maintenance that she's paying taxes on. There have been no actions to reduce maintenance filed by him. As of today, would the maintenance be gone? Yes, because she is married. She is married. She is married now. As of today, you ask me, Justice, would it be gone? It would be gone because she is married. Well, it would have been gone on November 1, 2010. Somewhere around there, yes. Regardless. Regardless. So what about the trial court's finding about your client's budget being suspect because she listed real estate taxes on two homes? The, when the judge said that, the real estate taxes on two homes, when she did that, I believe that she had two homes. She had the home that she had purchased, the, quote, new home, and she had the other home, the marital home. I think that that is, we tried to explain. I don't know that the judge ever got that. But as I put in my brief, he was quick to jump on that and said absolutely nothing about the statements of Kevin Hader as far as his inflation of his budget, as far as Kevin Hader and the money that he was receiving, the $7,200, there was never a reporter, nothing was ever said of. He wasn't critical at all about the monies that Kevin said that he wasn't making when, in fact, it flew right up in his face that he was making as much money, if not more, than he did before we were in court. As far as the third job, I want to make sure that I get that in the record. What was the testimony of his employer about the economy on his income? The, his employer, the gentleman that testified was not his employer. The gentleman that testified was his supervisor. He works for Broadcast Electronics. But essentially, what he said was that the economy did affect the income within his shop, within this company, within this, it's an electronics company. But he did say that based upon the dollars and cents that although overall, not only in the economy as it is, but overall within the pay schedule within his company, that Kevin Hader was doing better than he did the year before. Certainly that the economy, in my opinion, has affected everybody. No matter what it is, whether you're making the same amount of money or whether you're making less money, you still have to be affected because that price of bread and that price of milk has gone up. The only thing that I'd like to say there is it also affected, did affect Ms. Hader. Finally, to get to the last point, and I apologize if I have not touched everything, but to get to the last point, I would respectfully ask, and I know each of you will review my brief, I have addressed everything in that brief concerning Mr. Shearing's motion and in the reply. Finally, the second issue is the income tax exemption is concerned. I realize as the law submits that it is, in fact, discretionary. Again, I think the judge abused his discretion. I think he did because we have a child, two children actually, in which my client is paying $7,200 a year to support the one child, the two children actually. But with that, we believe and I believe that based upon the facts and the evidence presented that my client should be, in fact, entitled to not both, we never did ask for both, at least one of those children for an income tax exemption, and I think not to give it to her is an abuse of discretion. We have a situation, again, at the time where she is paying $7,200, getting nothing as far as credit for it other than the fact that it's her obligation under the law and as far as I'm concerned, morally, to support her children, but secondly, that she gets no income tax credit and she is, in fact, entitled, we believe, to the monies for the income tax exemption. What was the percentage of the support that she paid? 28%. I meant actual expenses. I'm sorry? I meant actual expenses for providing. I don't know if that was ever presented. I defer to the record, but I don't know if that was ever presented as far as, because I don't think that Mr. Hader ever presented it cost me X number of dollars to support these two children. And without that, we have no way of knowing other than our recollection of what it cost when she was at home and was a primary caretaker. Well, if she's the one asking for the tax exemption, wouldn't that be her burden? I believe it would be her burden, but once we put the monies into, perhaps the wrong word, into play, once we put that we are paying this, it wasn't a question of was she delinquent, had she paid, had she paid. Once we put that into play, I think the burden then shifts to him to show that it hasn't happened because we put it before the court. She is paying. She is paying more than she has to to qualify. So you're saying that her percentage of income she pays in child support is 28%? It's 28% of her income, as is required by statute. Again, I can go on, but my time is up. Does anyone have any other questions? No questions. Thank you. Thank you very much. Mr. Shearing? May I please report to Mr. Heck? First, I'd like to address some of the remarks made by Mr. Heck, but before doing so, as the court can see from this record, this case has been going on basically from June 15, 2005, when Mr. Heider did file a petition for dissolution of marriage. There were many issues after Judge Drummond issued his decision that arose. In fact, this case was on appeal on the merits of the case and on the decision by Judge Drummond. Ms. Heider filed that appeal and addressed various issues. One of the issues was, in fact, the amount of maintenance that she was awarded. What happened in that appeal as to that maintenance? It remained as is. All of the issues that she appealed on, the trial court's opinion was upheld. The court, Judge Drummond, in his decision on November 2, 2006, did set maintenance, and in his opinion, he stated that the amount is sufficient for the mother to maintain the marital home, should she decide to do so. The length of maintenance is sufficient for the mother to earn a college degree, should she choose to do so. What happened in 2009 is Ms. Heider filed a petition requesting that she receive the tax exemptions for the children, for at least one child. Mr. Heider then filed a petition, the petition was captioned to reduce maintenance, and that was filed on June 16, 2009. We had our first hearing in this case on October 23, 2009, did not complete that hearing, and then the second hearing was held on January 22, 2010. Mr. Heck first makes reference to Mr. Heider's income being the same as it has been in the past, or in fact, increasing. This is not supported by the record. At the end of the year, we were able to submit all of Mr. Heider's income that he received for 2009, and we submitted, and there are exhibits in the record of his income and the amount that his income had declined. At the initial hearing of the case, between 2001 and 2005, he had an average income of $172,000. In 2006 through 2009, he had an average income of $131,000. In the actual year, 2009, his income had even been below the $131,000. But still, assuming the state study, we would be projecting $120,000, which is more than he made the previous year, and it is $120,000 as compared to her $38,000. Actually, it is $21,000. But again, I think we submitted the change in his income, number one, and as Mr. Heck argued, or tried to argue, that the record supported that he in fact would have $140,000. That is not the case, and his income back in 2009 would be just a little over $100,000. I think the evidence was that he was going to be receiving $105,000. You also have to understand that in the years prior to that, with Mr. Heider having the sole care of custody of the two children, that in 2006 there was no child support paid. In 2007, there was $1,200 paid. In 2008, there was $6,800. In 2009, there was $7,200. Judge Drummond terminated maintenance as of January 1, 2010. He also terminated her obligation to pay child support up until June 1, 2010. So for this year, if she continues to pay the $324 per month, she would be contributing $1,944 towards the children's support. The court also found, and in many of the years that child support was set, that the court deviated from the recommended 28% child support, and in fact set the amount of child support below the 28%. I would also refer to Mr. Heck's statement that on her tax bill, which she submitted, that she had two residents, the record is clear that she didn't have two residents at that time, that she sold the one resident, she bought a brand new home for $255,000, plus she paid cash for a brand new automobile of some $27,000. There was no evidence submitted at either of the hearings in regards to the condition of the house. She mentions repairs, there was no evidence submitted as to what repairs had to be made, and I would refer the court also to the exhibit that was introduced at the initial hearing in this case, where there was appraisals of this residence, and each one of the appraisals do not indicate that there are any repairs needed, in fact say just the opposite, that there are no repairs that are needed. As far as Ms. Heider finding a work, or looking for a work, in Judge Drummond's decision he talks about her having seven months to find a job. She elected, I believe it's Judge Drummond's view, to continue with what she had done after the parties separated, and what she had done even during the length or the time that the parties were married, and that was to act as a travel agent. I differ with Mr. Heck, and I don't know if it makes any difference if she looked at two or three places. It's my recollection that she may have looked at three places, only sent a written application to two places. So she also did enroll in school, and she graduated in May of 2009, and again Judge Drummond was of the opinion that that was ample time for her to find a job in her field as a graphic art designer, and she elected not to. She went out and continued working at the travel company. The petition to reduce maintenance is captioned that, but I believe the Court has the discretion to consider that motion, or in fact terminate maintenance, which the Court did in this case. I think it's also important that the Court did not go back to June 16, 2009 when the initial motion was filed. The Court could have made it retroactive back to that date, but elected not to. Made it retroactive back to January 1, the end of December 2009, or January 1, 2010 as to when it would be retroactive to. So he did not go back, and again say this was enough time basically for her to find a job in the area of graphic design and graphic art. As I indicated also, the child support was also terminated during that period of time from January 1 until June 1, so she did not have any obligation to pay any child support. I believe it's also important to consider the award of the marital estate, the amount of the award that she received. It's clear from the record that she received 60% of the marital estate. There was a house that she received. She sold that house. She elected to spend $255,000 for a new house. But she had that money, so she put $172,000 down as a down payment on that house. So she received 60% of the marital estate, and that amounted to $443,000 that she received out of the marital estate. And the Court, in setting the maintenance, did not set a specific amount in the beginning, but first set it for $3,000 for a month, and set it for two months for $3,000, and then said, OK, you're going to be taking over the house, and there was a payment on the house, we'll raise that to $4,000. From that time on, up until January 1, 2009, Mr. Heider was paying $4,000 a month, when in fact she had already sold the house and he paid that for a substantial amount of time. Um... Did you present evidence of other places of employment that she could have applied? She was asked as to other places that she looked at, or looked for a job, and there wasn't any. But you didn't present evidence that there were 20 graphic arts jobs available in this area? Uh, no. I mean, she was asked specifically where she looked, and she was not asked if you looked at a certain place that had a position available for her? Well, it seems that Judge Drummond found that the economy was bad and credited your client with the economy being bad, but then penalized his ex-wife because she hadn't found a new job in the same bad economy. I think he criticized her more for not making a good-faith effort to look for work in that area. And the testimony in regards to the economy particularly had to do with Broadcast Electric and the type of business that they have. Um, and... I mean, it's clear that Judge Drummond found that his income had gone down by 50%, because even more than that, we believe in the record, is almost 75% as to a decrease in his income for the year 2009. And, again, he still had the major responsibility of maintaining the children. Uh, he was getting very little support from her, and had not received much support from her. So I think Judge looked at the totality of the circumstances and, uh, terminated the maintenance. Uh, again, we think the, uh, you know, to show the substantial change in circumstances, we believe there was three areas. Number one, being his, uh, reduction of income. Uh, number two, the fact that she had graduated from college, which was addressed in Judge Drummond's original decision. And the fact that she had obtained full-time employment. Through many hearings, and even at the time of the initial hearing on the divorce, uh, she was working part-time. And, uh, Mr. Heck alludes to the fact that it was in his... excuse me, I've got a cold for three weeks. Anticipated she was going to find a, uh, full-time work, but it wasn't. That's all I have at this time. Is there any questions? Do we have water in the conference room? I don't... You might want to check. You need to take a short break. Yeah. Mike was gone. Are you finished? I'm finished. I'll answer some other questions. Thank you. Mr. Heck, rebuttal. May it please the court. My long-time friend is choked up. He does that all the time when we argue cases. Does it help him? No, it makes me cry once in a while. May it please the court, just very briefly. Mr. Shearing pointed out several things I want to address. The, uh, first is... we've been before the... not this panel, but before the court on the issue of maintenance before and it affirmed the fact that she was in need of maintenance. This court affirmed the fact that she was in need. Now, we were in court in 2009. Contrary to what Mr. Shearing has said, if you look at my brief, page 10, about repairs of the home, she and I might have performed repairs, at the second from the bottom, it's stated, transcript, volume, Roman numeral 18, page 38, the lines, and then line 5. That testimony was, in fact, given. As far as the income declining, that, if it did decline, I submit to the court that when we presented our evidence, when we brought in our testimony, and that was from, as is put forth on page 14 of my brief, when we brought in Mr. Bieler, Mr. Kevin Hader, immediate supervisor, he showed that through July 24, 2008, as is shown on page 14 of my brief and the transcript is quoted, that he had earned to date commissions of $28,859.93 and a gross pay of $63,475.26. Add those together, it's right around $91,000. Again, that was through July. What he did after that is he has control of that. The salary remains his commission is up to his efforts. As far as the economy, I submit the same thing. If the economy has affected Kevin Hader, it certainly has affected his then ex-wife. We've heard about the brand new home. Contrary again to what Mr. Schering said, that's all supported by the record. She can't support it. She can't support the home. We heard again about all this money and he put, I think, $443,000. I tried to, but it is all supported by the record. On page 11 of my brief, a lot of that, most of that, if you take the house out of the picture was Mr. Hader's Broadcast Electronics 401k that is not either accessible nor liquid. It received funds that would require penalties and fees through an American Financial, an IRA account, and a Bright Star account  All of those are taxable. All of those require a substantial deduction if taken. So when you say $60,000, $40,000 so be it. Good faith effort. I don't know what else you can do. It is supported by our record. It is supported in our brief that when she not only looked at the two places that have been cited and by that I mean there are three places cited in our brief and as I stand here now I can't think of the other one but they are cited. I've already argued this but she did follow it up. It wasn't like she was you can't go to McDonald's and get a job in this area. She did everything that could be reasonably expected of her to follow this up. The jobs were not and still are not there. She did make a good faith effort to find a job. The new auto, again, supported by the record. We had two children. She feels it's not worthy to move these children around the same way with a home. They've got, as Mr. Schering says, they've got a man during a married life and he's put his children a lifestyle of $175,000, $190,000 a year and all of a sudden she's supposed to go to a two room flat and a second floor. She's got to have appropriate housing for the children. It's in the record. It was a new car. It was a private car like a high dollar car but it wasn't a car, a new vehicle. Anything else? I've got some more I can say but I think we've all made our points. Thank you very much. Thank you, counsel. We'll take this matter under advisement and adjourn for the day.